SAMEEENA AZHAR,         )
                           )
      **Plaintiff,**      )
                           )     **No. 16 C 10390**
  **v.**                   )
                           )     **Chief Judge Rubén Castillo**
THE UNIVERSITY OF CHICAGO,  )
                           )
      **Defendant.**    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Sameena Azhar filed this employment discrimination case against the University of Chicago on November 7, 2016. (R. 1, Compl.) Before the Court is the University of Chicago's motion for summary judgment. (R. 78, Def.'s Mot. Summ. J.) For the reasons that follow, the motion is granted.

### RELEVANT FACTS

The following facts are undisputed unless otherwise noted.[1] Plaintiff Sameena Azhar ("Azhar") was a University of Chicago ("the University") doctoral candidate at the University's School of Social Service Administration ("SSA") from 2012 until 2018. (R. 90, Pl.'s Resp. SOF ¶ 3.) Her specific research interest is human immunodeficiency viruses ("HIV"). (*Id.*) Azhar was first introduced to Dr. John Schneider because of their shared research interest in HIV. (*Id.* ¶ 13.) Dr. Schneider is an associate professor of medicine within the University's Department of Medicine's Section of Infectious Diseases and Global Health, an associate professor of

---

[1] As discussed in greater detail below, Plaintiff's response to Defendant's Local Rule 56.1 Statement of Material Facts is replete with argument, conclusions, and assertions of fact that are not supported by Plaintiff's citation to the record. (R. 90, Pl.'s Resp. SOF and Add'l Facts.) The Court disregards those improper portions of Plaintiff's response. *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015).

epidemiology in its School of Public Health, and a member of numerous University committees focused on work in India. (*Id.* ¶ 4.) His clinical specialization focused on adolescent and adult HIV primary care. (*Id.* ¶ 5.) Dr. Alida Bouris is an assistant professor at SSA who teaches courses on social work practice and cognitive-behavioral therapy, and focuses her research on adolescent health and HIV/AIDS prevention and treatment. (*Id.* ¶ 7.) Dr. Melissa Gilliam is a professor in the University's Departments of Obstetrics and Gynecology and Pediatrics. (*Id.* ¶ 8.) She is also the Vice Provost for the University, leading its efforts around faculty development and institutional diversity, including overseeing the Center for Identity and Inclusion, the Center for the Study of Gender and Sexuality, and the Center for the Study of Race, Politics and Culture. (*Id.*)

In 2014, Dr. Schneider agreed to serve on Azhar's dissertation committee and Dr. Bouris agreed to chair it. (*Id.* ¶ 16.) Full-time students in the SSA doctoral program like Azhar must complete a pre-dissertation research project, research and teaching assistantships, and a dissertation. (*Id.* ¶ 11.) In 2015, Azhar was engaged by Dr. Bouris to grade papers and serve as a teaching assistant. (*Id.* ¶ 12.) She also provided academic research to Dr. Bouris and is listed as an author in an upcoming article. (*Id.* ¶ 15.) Azhar also provided academic research to Dr. Schneider for two articles, one of which was published and lists her as an author. (*Id.* ¶ 14.)

While she was an SSA student, Azhar received numerous grants, fellowships, and scholarships. (*Id.* ¶ 9.) For example, she was selected in 2013 for a Ford Foundation fellowship by a faculty group that included Dr. Bouris and Dr. Gilliam. (*Id.* ¶ 10.) Dr. Schneider wrote multiple letters of recommendation for Azhar to help her obtain grants or fellowships. (*Id.* ¶ 17.)

## I. Azhar's Employment with Chicago Center for HIV Elimination

Drs. Schneider and Bouris co-founded and now serve as Director and Co-Director of the University's Chicago Center for HIV Elimination ("CCHE"), a research center for academic, research, medical, and clinical programs and services dedicated to eliminating new HIV transmissions in certain at-risk populations. (*Id.* ¶ 20.) Because CCHE is part of the University, people who work for CCHE are University employees. (*Id.* ¶ 22.) Dr. Schneider hired Azhar as a part-time student-employee at CCHE in March 2015. (*Id.* ¶ 27.) Employees and collaborators of CCHE include affiliated faculty members, staff, student-employees, and post-doctoral scholars. (*Id.* ¶ 24.) Two post-doctoral scholars, Lindsey Young, who is white, and Aditya Khana, who is South Asian, and one doctoral candidate, Britt Livak, who is white, were also employed there. (*Id.* ¶¶ 25, 29.)

While at CCHE, Azhar worked on an observational study called the Building Agent-Based Models of Racialized Justice Systems ("BARS") Project. (*Id.* ¶ 27.) She was paid $17 per-hour, which was more than any other student who worked at CCHE. (*Id.* ¶ 28; R. 90-1, Eavou Dep. Tr. at 73-74.) It is undisputed that Azhar did most of her work remotely, although the parties disagree as to the reason. (R. 90, Pl.'s Resp. Def.'s SOF ¶ 34.) In addition to an off-campus location called "the Village," CCHE had three separate on-campus workspaces during Azhar's employment there: third floor hallway space by Dr. Schneider's office, fifth floor shared office space, and cubicle space in a basement suite. (*Id.* ¶ 30.) At various points in 2015, the fifth floor office was shared by one African-American staff member, one Latino staff member, one white staff member, and one white student. (*Id.* ¶ 33.) According to Rebecca Eavou, who assigned office space for CCHE at the time, the basement work space was used by two white staff members, one white post-doctoral candidate, one white student, six African-American staff

members, one South Asian post-doctoral candidate, and two South Asian students at various points in 2015. (*Id.* ¶ 32.) Azhar does not dispute that at least one white employee worked in the basement, but she nevertheless asserts that students of color understood that they were relegated to the basement office, which was less desirable because of its mold problem. (*Id.*)

At the time Azhar worked on the BARS study, it was still in its development stage and did not yet involve interviewing participants. (*Id.* ¶ 36.) Accordingly, her work did not involve any face-to-face research subject contact but instead involved helping to schedule, coordinate, and memorialize project meetings. (*Id.* ¶ 35.) The University also did not anticipate that Azhar's work would include conducting interviews. (*Id.* ¶ 37.)

## II. Azhar's Request for Business Cards

Students who worked for CCHE typically did not receive business cards. (*Id.* ¶ 40.) Dr. Schneider's general policy was that only faculty and full-time staff received business cards, unless the student's project involved research participant engagement. (*Id.*) The two post-doctoral candidates at CCHE received business cards, as did Livak. (*Id.* ¶¶ 41, 42, 48.) On October 31, 2015, Azhar requested business cards in order to have them for upcoming meetings and conferences. (*Id.* ¶ 43.) On November 2, 2015, after conferring with Dr. Schneider, Eavou informed Azhar that CCHE generally does not order cards for graduate students. (*Id.* ¶ 44.) By 9:00 a.m. the next morning, Azhar had sent six emails questioning the decision, and explaining her reasons for wanting the cards. (*Id.* ¶ 45.) According to Azhar, she had seen Livak and one of the post-doctoral candidate employees with cards, and so she believed that obtaining the cards reflected an equity issue. (*Id.* ¶ 45.) Specifically, she wrote that "issues of equity at CCHE . . . encompass age, race/ethnicity, and gender." (*Id.* ¶ 46; R. 92, Def.'s Resp. Pl.'s Add'l SOF ¶ 1.)

Although Dr. Schneider agreed "[t]here are serious issues surrounding age, race/ethnicity and gender at CCHE, the BSD [Biological Sciences Division], SSA and at the University," he did not agree "this specific issue [was] one of them." (R. 90, Pl.'s Resp. Def.'s SOF ¶¶ 46, 48; R. 90-1, Pl.'s Ex. 11, CHI00004, Schneider Nov. 3, 2015 email.) Instead, Dr. Schneider explained that Azhar's role did not involve client contact, and he had not anticipated that it would. (R. 90, Pl.'s Resp. SOF ¶ 47.) Livak's CCHE position, on the other hand, involved direct client-contact. (*Id.* ¶ 48.) In Azhar's sixth November 3, 2015, email on the subject, she apologized for the "flaming" nature of her earlier messages. (*Id.* ¶ 49.) Nevertheless, she sent another three emails before noon on November 5, 2015 (*id.* ¶ 50), and called Eavou to discuss her request. (*Id.* ¶ 51.) Eavou testified that Azhar threatened legal action during the call, which Azhar denies. (*Id.* ¶ 51; R. 80-5, Eavou Dep. Tr. at 113:05-114:03; R. 90-1, Pl.'s Ex. 4, Azhar Decl. ¶ 12.)

Shortly after noon on November 5, 2015, Dr. Schneider emailed Azhar to inform her that her emails had been inappropriate and combative, and that he was suspending her for four months. (R. 90, Pl.'s Resp. SOF ¶¶ 52, 53, 59.) He explained that her messages reflected "a sense of entitlement with limited respect for boundaries," and a lack of understanding of her role as a student-employee. (*Id.* ¶ 52.) Dr. Schneider chose suspension over termination because he wanted Azhar to learn from the situation, and to return to CCHE. (*Id.* ¶ 58.) The day after receiving the news, Azhar sent three emails to a total of 40 people stating that "underlying reasons of racial and gender equity" had prompted her suspension. (*Id.* ¶ 54.) On November 7, she emailed another 11 people to inform them of her suspension, and that "the cause for my suspension [was] related to my raising issues at the workplace regarding inequities in pay, benefits and treatment of staff, which were based on age, race/ethnicity, and gender." (*Id.* ¶ 55.)

On November 9, 2015, Azhar unexpectedly visited the office of another member of her dissertation committee to discuss what had transpired at CCHE, although the parties disagree as to the conversation that took place there. (*Id.* ¶ 56.)

On November 9, 2015, Chris Yanos, Director of Human Resources at BSD, advised Azhar, that there are no suspensions for student-employees, and that therefore her employment with CCHE had been terminated. (*Id.* ¶ 57.)[2] In the meanwhile, Dr. Schneider had also concluded that Azhar's response to the suspension had been inappropriate and unprofessional, and warranted her termination. (*Id.* ¶ 61.)

Both Dr. Schneider and Dr. Bouris testified that while working with Azhar on her dissertation, they had observed her similar lack of respect for boundaries and professional roles. (*Id.* ¶ 19.) Specifically, Drs. Schneider and Bouris complained that Azhar made unscheduled calls to them, sent numerous emails, and requested dissertation edits within 48 hours without regard to their workloads and other commitments. (*Id.* ¶¶ 18, 19; R. 80-2, Def.'s Ex. H., Bouris Dep. Tr. at 94:04-14, 100:24-101:19, 102:02-11, 103:02-08, 109:20-110:01, 114:03-17; R. 80-2, Def.'s Ex. I, Schneider Dep. Tr. at 116:10-117:19, 125:11-127:13.) According to Azhar, however, she never did any such thing. (R. 90, Pl.'s Resp. Def.'s SOF ¶ 18; R. 90-1 at 43, Pl.'s Ex. 4, Azhar's Decl. ¶¶ 6, 8.) Moreover, she says, she communicated with Dr. Bouris only by email, and she only called Dr. Schneider for business-related purposes a handful of times and always at appropriate hours. (R. 90, Pl.'s Resp. Def.'s SOF ¶ 19; R. 90-1, Pl.'s Ex. 4, Azhar's

---

[2] According to Azhar, Dr. Schneider suspended her "because he was upset that [Azhar] raised issues of race at CCHE," and "he wanted her to understand that as a woman of color, she should know her place[.]" (R. 90, Pl.'s Resp. SOF ¶ 58.) As discussed further below, however, Azhar cites only her own declaration to support this claim of his intent. (*Id.*) This is plainly insufficient. *Bass v. Joliet Public Sch. Dist. 87*, 746 F.3d 835, 841 (7th Cir. 2014) (speculation is not evidence at summary judgment).

Decl. ¶¶ 8, 9.) In any event, it is undisputed that prior to her suspension and termination from CCHE, Azhar had never received any warnings. (R. 92, Def.'s Resp. Pl.'s Add'l SOF ¶ 9.)

## III. The India Project

While at the University, Azhar had also been involved in another project, the "India Project," through the Center for Interdisciplinary Inquiry and Innovation ("Ci3"), an institution founded by Dr. Gilliam. (*Id.* ¶ 63.) In the fall of 2015, Azhar requested to work on the India Project, since she was already planning to be in India later that year collecting data for her dissertation. (*Id.* ¶¶ 64-65.) Dr. Gilliam agreed, and Ci3 purchased Azhar's plane ticket from Hyperabad to Lucknow, where the project work was to take place. (*Id.* ¶ 66.) According to Dr. Gilliam, Azhar was never an employee of Ci3 or the India Project, never received a contract for work on the project, and was told that project funder forbade paying for start-up work like that which Azhar was to perform. (*Id.* ¶¶ 66, 67.) According to Azhar, on the other hand, she was told on numerous occasions that she would be paid for her work which was not start-up work, but instead had spanned several months and included developing training materials for a research student and attending weekly meetings. (*Id.* ¶ 66; R. 90-1, Azhar Dep. Tr. at 109:06-113:10.) In any event, the project faced certain setbacks, and the work that Azhar was scheduled to perform while in India could not be performed at that time. (R. 90, Pl.'s Resp. Def.'s SOF ¶ 70.) On December 10, 2015, Dr. Gilliam informed Azhar that she would not be able to assist with the project as initially planned. (*Id.* ¶ 71.)

## IV. The University's Investigation of Azhar's Discrimination Claim

After her CCHE termination, Azhar complained to the University of discrimination. (*Id.* ¶ 74.) Associate Provost for Faculty & Student Affairs Ingrid Gould led the investigation of Azhar's complaint. (*Id.*) Azhar specifically alleged that Drs. Schneider, Bouris, and Gilliam had

discriminated and retaliated against her based on her race, gender, and religion. (*Id.* ¶ 75.) She claimed that all three doctors were Jewish and that their actions had demonstrated anti-Muslim sentiment reflective of a pattern of such bias both on the campus and nationwide. (*Id.* ¶ 76.) The University's investigation determined there was no evidence of discrimination on the basis of gender, sex, race, or religion, or of retaliation for her complaint. (*Id.* ¶ 78.)

## PROCEDURAL HISTORY

Azhar began this action with the filing of her complaint on November 7, 2016. (R. 1, Compl.) She amended her complaint on January 30, 2017 (R. 18, Am. Compl.), and again on February 23, 2017. (R. 24, Second Am. Compl.) Azhar's second amended complaint included claims of race and national origin discrimination and retaliation under Title VII, 42 U.S.C. § 2000e-2(a)(1), and race and color discrimination under 42 U.S.C. § 1981. (*Id.*) The retaliation claim was dismissed on April 4, 2017. (R. 34, Mem. Op.) Discovery was set to be completed by February 28, 2018, on the remaining claims (R. 43), but when Azhar had not complied with an order compelling responses to certain discovery requests, this action was dismissed without prejudice on February 8, 2018. (R. 54, Min. Entry.) Azhar's motion to reinstate was later granted, and discovery was twice extended. (R. 62, 70, Min. Entries.) The University moved for summary judgment on November 8, 2018. (R. 78, Def.'s Mot. Summ. J.) Azhar's deadline to respond was extended twice at her request, with the final deadline being January 8, 2019. (R. 85, 88, Min. Entries.) Without seeking leave of court, Azhar filed her response in opposition to the motion on January 11, 2019. (R. 89, Pl.'s Resp.) The University filed its reply on February 4, 2019 (R. 91), and the motion is now ripe for resolution.

# LEGAL STANDARDS

## I.  Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotation omitted). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether a dispute exists, the Court must "consider all of the evidence in the record in the light most favorable to the non-moving party[ ] and . . . draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (quotation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file)

to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [his or her] favor." *Id.* (internal quotation omitted).

"Inferences supported only by speculation or conjecture will not suffice," and neither "will the mere scintilla of evidence." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). Not all disputes of fact preclude summary judgment, but instead, only those that are both material and genuine. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). Factual disputes that are irrelevant or unnecessary factual do not preclude summary judgment. *Id.* In deciding a summary judgment motion, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson*, 477 U.S. at 255; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Instead, the Court's function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249).

## II.    Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 governs how the parties identify material facts and potential disputed material facts. "The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Local Rule 56.1(a) "requires the party moving for summary judgment to file and serve a 'statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'" *Id.* at 218 (quoting N.D. ILL. L. R. 56.1(a)(3)). "The non-moving party must file a response to the moving party's statement, and, in the case of any disagreement,

cite 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014) (quotation omitted); *see also* N.D. ILL. L. R. 56.1(b)(3)(A). The nonmoving party may also file a separate statement of additional facts. N.D. ILL. L. R. 56.1(b)(3)(C). The failure to file a timely response to a summary judgment motion may result in the Court deeming admitted the uncontroverted facts in the moving party's Local Rule 56.1 submission to the extent they are supported by evidence in the record. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

Local Rule 56.1 statements and responses should identify the relevant admissible evidence supporting asserted material facts, not make factual or legal arguments. *See Zimmerman v. Doran,* 807 F.3d 178, 180 (7th Cir. 2015). The Court is not required to "wade through improper denials and legal arguments in search of a genuinely disputed fact." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000); *accord Curtis*, 807 F.2d at 219. Likewise, "[m]erely saying that a fact is disputed does not transform it into a disputed issue of fact sufficient to survive a summary judgment motion." *Cardoso v. Cellco P'ship*, 13 CV 2696, 2014 WL 6705282, *1 (N.D. Ill. Nov. 26, 2014). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Curtis*, 807 F.3d at 218 (internal quotation omitted). "The non-moving party's failure to admit or deny facts as presented in the moving party's statement or to cite to any admissible evidence to support facts presented in response by the non-moving party render the facts presented by the moving party as undisputed." *Id.* at 218-19. The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere*, 791 F.3d

764, 767 (7th Cir. 2015); *accord Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

## ANALYSIS

The University moves for summary judgment, arguing that Azhar has failed to present either direct or circumstantial evidence of race, color, or national origin discrimination, that she was meeting her employer's legitimate expectations, or that the reason given for her suspension and termination were pretext for discrimination. (R. 79, Def.'s Mem.) According to the University, there is also no evidence to show that following her termination she was removed as an author from any publication, which regardless, it says, is not actionable, and no evidence to suggest that her race, color, or national origin prevented her from working on the India Project or was the reason she was suspended and ultimately terminated from CCHE. (*Id.* at 9-15). Instead, the University urges, it is undisputed that she was suspended and terminated because of her inappropriate emails which Dr. Schneider believed followed a pattern of inappropriate behavior. (R. 91, Def.'s Reply Supp. Mot. Summ. J. at 13-14.)

According to Azhar, on the other hand, evidence in the record supports her discrimination claims. (R. 89, Pl.'s Resp. at 7-10.) As Azhar sees it, the University's stated reason for her termination is itself evidence of discrimination through the use of stereotypes. (*Id.* at 8.) Specifically, she urges that Dr. Schneider's reference to Azhar's sense of entitlement and not knowing her place reflects a discriminatory animus against her. (*Id.*) She also asserts that she has demonstrated a prima facie case of discrimination under the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1983), based on evidence in the record that a white graduate student-employee was given CCHE cards while she was not, Dr. Schneider's acknowledgement that she should have been eligible to receive them, and his acknowledgement

that there were racial equity issues at CCHE. (*Id.* at 9-10.) On this record as well as certain

failures she identifies in the University's investigation of her discrimination claim, Azhar argues

it is more likely than not that the University's stated reason for her termination is pretext for a

discriminatory animus. (*Id.* at 10.)

At the threshold, the Court notes that because Azhar's opposition to the University's

summary judgment motion was filed several days beyond her twice-extended opposition

deadline, it is well within the Court's discretion to deem all of the University's well-supported

assertions of fact as admitted. *See Keeton*, 667 F.3d at 880. This is especially so given that Azhar

did not seek permission for her late filing or otherwise attempt to explain her delay. *See id*;

*Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). Nevertheless, the Court has

considered Azhar's submission on the merits and finds that it fails to demonstrate a genuine

dispute of material fact and fails in significant measure to comply with the clear requirements of

Northern District of Illinois Local Rule 56.1.

Many of Azhar's responses to the University's asserted facts improperly rely on legal

arguments, conclusions, and self-serving characterizations of undisputed evidence. (*See, e.g.*,

R. 90, Pl.'s Resp. SOF ¶¶ 18, 19, 32, 35, 37, 39, 55, 58, 59, 61, 73, 78.) "Reference to legal

arguments to support a denial of a material fact is not contemplated by the rule."

*Bordelon*, 233 F.3d at 529. Several of Azhar's responsive statements are inadequately supported

by citation to the record (*see, e.g., id.* ¶¶ 18, 19, 27, 32, 55, 58, 59, 61), while still others claim

citation to the record, but the cited exhibit does not support Azhar's asserted fact. (*See, e.g., id.*

¶¶ 9, 21, 27, 28, 31, 32, 34, 35, 37, 51, 58, 59, 61, 73, 76, 78; R. 92, Pl.'s Add'l SOF ¶¶ 5-7.)

None are proper in a Local Rule 56.1 statement. *See Curtis*, 807 F.3d at 219. Accordingly, the

Court deems as admitted the well-supported paragraphs of the University's Local Rule 56.1

statement to which Azhar responded in dispute with assertions of fact that are not properly supported by evidence in the record. *See id*. at 218-19; *Cracco*, 559 F.3d at 632.

The Court also notes at the outset that Azhar's response abandons two components of her discrimination claims. (*Compare* R. 24, Second Am. Compl. ¶¶ 24, 25, 36, 37, *with* R. 89, Pl.'s Resp.) Specifically, she failed to respond to the University's argument that she was not removed as an author, and that even if she had been, such an action would fall outside of her discrimination claims. (R. 89, Pl.'s Resp.) She also failed to respond to the University's argument that her removal from the India Project was based on a legitimate, non-discriminatory reason. (*Id.*) Azhar's single brief mention of either event is only in support of her cursory argument that the University's post-termination conduct is circumstantial evidence of its discriminatory motive in terminating her, and not that either act could itself gave rise to her claims. (*Id.* at 8-9.) Accordingly, Azhar's previously asserted discrimination claims based on removal as an author or removal from the India Project are waived. *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

That leaves Azhar's Title VII and Section 1981 claims that her suspension and termination from University employment were based on her race, color, or national origin. The legal analysis for discrimination claims under both statutes is identical. *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017); *Lane v. Riverview Hosp.*, 835 F.3d 691, 695 (7th Cir. 2016). Accordingly, the question before the Court is simply whether there is any evidence that would permit a reasonable factfinder to conclude that a protected characteristic of the plaintiff caused the adverse employment action of which she complains. *Ortiz v. Werner*

*Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). As the Seventh Circuit explained in *Ortiz,* direct and indirect evidence are not to be separately analyzed when assessing discrimination claims. *Id.* "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself[.]" *Id.*

The holistic approach set out by the Seventh Circuit in *Ortiz* supplements, but does not replace the well-established burden-shifting framework for discrimination claims of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973). *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719-20 (7th Cir. 2018) ("However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* [her protected characteristic]."). "*McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," but it "is not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Accordingly, the Court conducts the *McDonnell Douglas* analysis if the plaintiff present arguments in those terms, but also assesses the plaintiff's evidence "cumulatively" under *Ortiz*. *Id.* In this case, Azhar argues both that she presents sufficient evidence of discrimination when viewed cumulatively, and that she does so under the *McDonnell Douglas* burden-shifting framework. (R. 89, Pl.'s Resp. at 7-11.) The Court thus considers both approaches to Azhar's claims.

Although the parties view the import of the facts differently, the facts themselves are largely undisputed. It is undisputed that CCHE student-employees who received business cards were either post-doctoral employees or employees with client-facing work. (R. 90, Pl.'s Resp. Def.'s SOF ¶¶ 41, 42, 48.) Similarly, it is undisputed that Azhar did not perform client-facing

work nor was it expected that she would do so. (*Id.* ¶¶ 35-37, 47, 48.) The way in which Azhar

requested business cards, the response she received from her employer, and Azhar's reaction to

the decision are also all matters of undisputed fact. (*Id.* ¶¶ 43-50, 54, 55.) Further, it is

undisputed that Dr. Schneider made the decision to suspend and then terminate Azhar based on

his conclusion that her behavior had violated professional boundaries, and had shown a lack of

respect for the structure of her workplace. (*Id.* ¶¶ 52, 53, 59-61.)

Azhar argues, however, that a reasonable jury could conclude that her suspension and

termination were based on her race, color, or national origin based on the pairing of Dr.

Schneider's acknowledgment of racial equity issues at CCHE and his conclusion that her emails

reflected a sense of entitlement which she says is code for discrimination, as well as "evidence of

other employees of color suffering various adverse employment actions." (R. 89, Pl.'s Resp. at 7-

9.) According to Azhar, the record reflects a "normal email exchange" which "quickly led to

termination after Azhar mentioned she believed there were racial equity issues at CCHE." (*Id.* at

8.)

Azhar's argument, however, fails on numerous grounds. First, inexplicably absent from

Azhar's submission is any statement of fact supported by the record demonstrating that she is a

member of the protected categories for which she claims discrimination. (R. 90, Pl.'s Resp. SOF

and Add'l SOF.) According to the allegations of Azhar's complaint, she is Muslim and Indian

American. (R. 24, Second Am. Compl. ¶ 3.) Of course, complaint allegations are not evidence

for purposes of summary judgment. FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 324 ("[Federal

Rule of Civil Procedure] 56(e) . . . requires the nonmoving party to go beyond the pleadings[.]");

*Beard v. Whitley Cty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988) ("[W]hen confronted with a

motion for summary judgment, a party who bears the burden of proof on a particular issue may

16

not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." ).[3] Despite this fundamental omission, however, the Court continues its analysis in order to address the thrust of the parties' dispute.

Second, the fact that Azhar finds her email exchange to be "normal" does not create an issue of fact. *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1056 (7th Cir. 2006) ("[Plaintiff's] own opinion whether he was doing the job satisfactorily is beside the point . . . the relevant question is not whether criticisms of his performance were right or wrong but whether his supervisor honestly believed them."). According to the University, Azhar was suspended and terminated because she crossed professional boundaries, failed to respect faculty's competing obligations, and failed to appreciate her role as a student-employee. (R. 90, Pl.'s Resp. SOF ¶¶ 52, 53, 59.) While it is apparent that Azhar strongly disagrees with the University's assessment, she points to no evidence in the record from which it could reasonably be concluded that the University did not honestly believe its stated reasons for its decision. (*Id.*) "Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) (noting court does not sit as a "super-personnel department").

Third, Azhar's emphasis that the termination decision followed on the heels of her raising a race-based complaint is not itself evidence from which a reasonable factfinder could conclude that her termination was based on any protected characteristic without more concrete evidence of discriminatory intent. The Seventh Circuit has repeatedly held that "suspicious timing alone is

---

[3] Although the University admitted that Azhar alleged she is Muslim and Indian American, it answered with a lack of knowledge as to the truth of Azhar's allegation. (R. 27, Answer ¶ 3.)

rarely enough to survive summary judgment." *Nichols*, 755 F.3d at 605 (internal quotation omitted).

Fourth, Azhar's evidence as to other employees' complaints of discrimination is far too generalized and unrelated to the facts and decision-makers at issue here to call into question the University's decision in terminating her employment. *See Seymour-Reed v. Forest Preserve Dist.*, 752 Fed. App'x 331, 335 (7th Cir. Oct 12, 2018) (plaintiff's comparator evidence consisting of his testimony about other employees and a single document regarding an accusation against another employee was "too vague to raise a jury question about whether [plaintiff] was singled out because of his race and sex."); *Bass*, 746 F.3d at 841 (affirming summary judgment for employer where employee asserted but provided no support to show that similarly situated employees not of her protected characteristic were treated differently). Unlike in Azhar's cited authorities, *Henderson v. Shulkin*, 720 Fed. App'x 776 (7th Cir. Dec. 22, 2017), and *Ross v. Board of Regents*, 655 F. Supp. 895 (E.D. Wisc. 2009), Azhar's testimony as to other employees' experiences is largely inadmissible hearsay, *see Haywood v. Lucent Techs., Inc.*, 324 F.3d 524, 533 (7th Cir. 2003) (overruled on other grounds by *Ortiz*), and she puts forward no evidence from other complainants at all, let alone complainants within her own protected class. (R. 90, Pl.'s Resp. SOF and Add'l SOF.) Instead, she relies on sweeping generalizations without regard for the record or any effort to tie her broad assertions to her case. (R. 89, Pl.'s Resp. at 8.) For example, Azhar argues (without citation to the record) that "white employees enjoyed more liberties," and had offices on the fifth floor while employees of color "were relegated to the basement" (*id.*) despite that she concedes in her Local Rule 56.1 statement that the fifth floor offices were occupied at various points in 2015 by one African-American staff member, one Latino staff member, and one white student. (R. 90, Pl.'s Resp. SOF ¶ 33.)

Taken together and interpreting the facts in the light most favorable to Azhar, the evidence on which she relies is insufficient to support a jury verdict of discrimination based on race, color, or national origin. *See Ortiz*, 834 F.3d at 765.

Azhar also contends, however, the she presents an issue of material fact under the analytical framework of *McDonnell Douglas*. (R. 89, Pl.'s Resp. at 9-11.) Under this well-established framework, Azhar has the initial burden of establishing that she: (1) is a member of a protected class; (2) was meeting the University's legitimate performance expectations; (3) was subjected to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably by the University. *See McDonnell Douglas*, 411 U.S. at 802. If she makes this showing, the burden then shifts to the University to come forward with a legitimate, nondiscriminatory reason for the challenged employment action. *See id.* If the University does this, then the burden shifts back to Azhar to produce evidence establishing a genuine dispute of fact about whether the University's reason was a pretext for discrimination. *See id.* at 804.

For similar reasons that Azhar fails to cumulatively support her claim, she likewise fails to meet her burden under *McDonnell Douglas*. As discussed above, she fails to assert let alone support that she is a member of a protected class, the first prong of any discrimination claim. But even if she had not overlooked this critical component of her claims, however, the Court would still find that she fails to make a prima facie showing. The parties focus their dispute on whether there is evidence in the record from which a reasonable factfinder could conclude that Azhar was meeting the University's legitimate expectations at the time of her suspension and termination, that comparable employees not sharing Azhar's protected characteristics were treated more favorably than Azhar, and that the University's stated reason for her suspension and termination

was pretext for invidious discrimination. As to each element, Azhar fails to submit evidence in the record from which to support her claim.

As set forth above, while Azhar argues that "[t]he emails at issue are not unprofessional nor do they demonstrate some sort of undue entitlement," (R. 89, Pl.'s Resp. at 9), her disagreement with the University's assessment of her performance does not create a relevant, material issue of fact. *Luks*, 467 F.3d at 1056. It is undisputed that the University suspended and terminated Azhar based on its determination that she had crossed professional boundaries and behaved inappropriately. (R. 90, Pl.'s SOF ¶¶ 52, 53, 59-61.) Azhar points to no evidence that student-employees who did not share her protected characteristics and who engaged in similar behavior were treated less harshly. (*Id.*) Under either a cumulative or a burden-shifting approach, Azhar's belief that her behavior was appropriate does not create a dispute of material fact. *Luks*, 467 F.3d at 1056.

Nor does Azhar's reference to stereotypes create a triable issue. "In cases in which the employer allegedly enforces job expectations in a disparate manner, [the Seventh Circuit] has noted that the expectations themselves may be tainted with discrimination, so the plaintiff needs to show only that [she] was singled out for worse treatment than similarly situated employees." *Seymour-Reed*, 752 Fed. App'x at 334-35 (quotation omitted) (affirming summary judgment for defendant where plaintiff's evidence showed only his disagreement with employer's termination decision, not that stated reason was false). Without circumstantial evidence of discrimination surrounding her suspension and termination or evidence that any similarly situated student-employee not of Azhar's protected categories engaged in similar behavior without suffering the same adverse consequence, Azhar fails to support her claims. *See id.* at 335-36; *Nichols*, 755 F.3d at 605.

Finally, even if Azhar could state a prima facie case, she likewise fails to demonstrate a genuine dispute as to pretext that would rebut the University's legitimate, non-discriminatory reason for suspending and terminating her. *See McDonnell Douglas*, 411 U.S. at 804. Her emphasis on Dr. Schneider's acknowledgment of "racial equity issues" and her claim this his language of boundaries was really code for discrimination is insufficient to create a triable issue. While she may believe that Dr. Schneider's decision was informed by a bias against her, she has not pointed to evidence in the record to support her claim. "Speculation is no substitute for evidence at the summary judgment stage." *Bass*, 746 F.3d at 841. The pretext analysis evaluates the honesty of the employer's explanation, not its validity or reasonableness. *Seymour-Reed*, 752 Fed. App'x at 335; *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013). In the end, Azhar's evidence does not suggest that the University used a false termination reason to cover up discrimination, but only that she disagrees with how her actions should have been viewed. Just as this fails to raise a question of fact as to legitimate expectations, it fails to raise a question of fact as to pretext. *E.g.*, *Seymour-Reed*, at 335.

This case is unlike Azhar's cited authority, *Baron v. W.W. Grainger, Inc.*, 944 F. Supp. 689 (N.D. Ill. 1996). In that case, the plaintiff supported her claim that the employer's assessment of her as unprofessional was based on a discriminatory stereotype that it had not applied to employees of other categories with evidence both that employees who engaged in similar behavior as the plaintiff were not terminated like her, and that while the employer had carefully documented complaints against plaintiff, it had failed to document the plaintiff's complaint of discrimination. *Id.* at 693-94. Here, on the other hand, Azhar simply asserts that Dr. Schneider's assessment was based on a stereotype and that he intended to put her in her place, but she fails to cite any evidence beyond her own declaration setting out her own belief. (R. 90,

Pl.'s Resp. SOF ¶¶ 58, 59; 90-1, Pl.'s Ex. 4, Azhar Decl. ¶ 13.) Azhar's opinion is not evidence that the University asserted a false reason to cover its discrimination, but only suggests why she disagrees with it. This is not enough. *Seymour-Reed*, 752 Fed. App'x at 335; *Bass*, 746 F.3d at 841.

Accordingly, the University's motion for summary judgment is granted.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (R. 78) is GRANTED. While the Court appreciates the strength with which Plaintiff disagrees with Defendant's assessment of what transpired, the question before the Court is simply whether Plaintiff presents any material issues of fact that require a jury determination in light of the undisputed facts. Because the Court concludes that she presents none, judgment is ENTERED in favor of Defendant and against Plaintiff on her complaint.

ENTERED: _____
**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: June 5, 2019**

22